David R. Markham (SBN 071814)
R. Craig Clark (SBN 129219)
James M. Treglio (SBN 228077)
Laura M. Cotter (SBN 259445)
**CLARK & MARKHAM, LLP**
600 B Street, Suite 2130
San Diego, CA 92101
Telephone: (619) 239-1321
Facsimile: (619) 239-5888

Nicholas Wagner (SBN 109455)
Andrew B. Jones (SBN 076915)
Daniel M. Kopfman (SBN 192191)
**LAW OFFICES OF WAGNER & JONES**
111 E. Herndon, Suite 317
Fresno, CA 93720
Telephone: (559) 449-1800
Facsimile: (559) 449-0749

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES BURDA, an individual, LAUREL HESS, an individual, CANDEE ERWIN, an individual, SHIRLEY PALAZZO, an individual, JOYCE SCHEMEL, an individual, LORI CALLISON, an individual, on behalf of themselves, and all persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FIDELITY NATIONAL MANAGEMENT SERVICES, LLC., a Delaware limited liability company doing business in the State of California, and DOES 1 through 100, Inclusive.<br>Defendants. | Case No. 8:11-cv-00247 JVS MLGx<br><br>**CLASS ACTION**<br><br>**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION UNDER F.R. CIV. P. 23; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br><u>Hearing</u><br><br>Date: March 19, 2012<br>Time: 1:30 p.m.<br>Ctrm: 10C<br>Judge: The Hon. James V. Selna |

1

**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**

Notice is hereby given that plaintiffs James Burda, Lori Callison, Laurel Hess, Shirley Palazzo, Joyce Schemel and Candee Erwin hereby move for an order certifying this action to proceed as a class action and ordering notice be given by U.S. Mail to potential class members. This motion to certify is made pursuant to Rule 23 (b) (2) and (b) (3) of the Federal Rules of Civil Procedure (F.R.Civ.P.). Argument on this motion will be heard on March 19, 2012 at 1:30 p.m. in Courtroom 10C located at 411 West Fourth Street, Santa Ana, CA 92701-4516, in front of the honorable Judge James V. Selna.

By this motion, plaintiffs seeks to certify the following defined class:

All current and former employees in California of Fidelity National Management Services, LLC who held the positions of "Title Officer," "Title Assistant," "Escrow Officer," or "Escrow Assistant," from January 5, 2007 to the present date, whose paychecks listed Fidelity National Management Services, LLC as payor, and who were (1) not provided with wage statements that itemize the components of their commissions and/or bonuses (2) did not receive overtime compensation on their bonuses and/or commissions (3) had deductions made from their commissions as the result of working overtime, (4) had their commissions reduced by the salaries and overtime compensation of their coworkers, (5) worked off the clock  without compensation, and/or (5) missed meal periods.

The motion should be granted as the proposed class meets all the requirements for certification under Rule 23 including (i) the class representative's claims are typical of those of the other class members; (ii) the class is so numerous it would be impracticable to bring them all before the court; (iii) common questions of law and fact predominate; (iv) plaintiffs and class counsel will adequately represent the class; and (v) a class action is superior to other methods for the fair and adequate resolution of the claims raised by the class under the California Labor Code and California Business & Professions Code section 17200. [1]

---

[1] Plaintiffs do not seek certification of their claims under Labor Code §2698, *et seq*., as both the California Supreme Court in *Arias v. Superior Court of San Joaquin County*

2

This motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the Declarations of Laurel Hess, James Burda, Candee Erwin, Shirley Palazzo, Lori Callison, Joyce Schemel, James M. Treglio, David R. Markham, the Reply Memorandum to be filed in response to any opposition to this motion, and upon any additional evidence accepted by the Court in consideration of this motion.

Dated: December 12, 2011          **CLARK & MARKHAM LLP**

By:___/s/David R. Markham_____
          David R. Markham, Esq.,
Attorney for Plaintiffs James Burda,
Laurel Hess, Lori Callison, Shirley
Palazzo, Candee Erwin and Joyce
Schemel

(2009) 46 Cal. 4th 969, 980-981, as well as numerous federal courts have held that those claims need not be certified. See *Cardenas v. McLane Foodservice*, 2011 U.S. Dist. LEXIS 13126 at 7; *Mendez v. Tween Brands, Inc.*, 2010 U.S. Dist. LEXIS 66454 at 8; *McKenzie v. Federal Express Corp.*, 2011 U.S. Dist. LEXIS 48707 at 29.

3

1

# TABLE OF CONTENTS

2

3

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

4

II.   APPLICABLE LAW TO CLASS CERTIFICATION . . . . . . . . . . . . . . . . . . . . . . . .8

5

III.  SUMMARY OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

6

7         A. The Class Representatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

8

IV.  THE CLASS MEETS ALL THE REQUISITES FOR CERTIFICATION UNDER
      FRCP RULE 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

9

10        A.   Summary of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

11        B.  Step One: Rule 23(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

12             1.  The Class is so Numerous That Individual Adjudication is Impractical. . . . 16

13

14             2.  The Proposed Class Representatives will Adequately Represent the Class. .17

15             3.  The Proposed Class Representative's Claims are Typical of
                   That of the Class. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

16

17             4.  Common Questions of Law Exist Between Plaintiffs and the Class. . . . . . . 19

18        C.  Step Two: Rule 23(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

19             1.  Class Adjudication is Superior to All Other Forms. . . . . . . . . . . . . . . . . . .20

20             2.  Issues Common To The Class Predominate Over Individual Issues. . . . . . . 21

21

22                  a.   The Plaintiffs and the Class Members Worked for Fidelity. . . . . . . . . . .23

23                  b.  Plaintiffs and the Class Members Received Inadequate Wage Statements
                        in Violation of Labor Code §226. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

24

25                  c.  Fidelity's Failure to Base its Overtime Compensation on Plaintiffs'
                        Commissions Earned. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

26

27                  d.  Unlawful Deductions From Pay For Escrow Officers, Title Officers and
                        Title Assistants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

28

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION;        Case No.: SACV11-0247
MEMORANDUM OF POINTS AND AUTHORITIES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

e.   Plaintiffs and Other Class Members Worked Off the Clock. . . . . . . . . .27

f.   Meal Periods and Rest Periods. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

V.      CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION;      Case No.: SACV11-0247
MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF AUTHORITIES

*Cases:*

*California:*

*Bell v. Farmers Insurance Exchange*
  (2001) 87 Cal. App. 4th 805 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Kerr's Catering Service v. Department of Industrial Relations*
  (1962) 57 Cal. 2d 319. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

*Martinez v. Combs*
  (2010) 49 Cal. 4th 35. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*Morillon v. Royal Packing Company*
  (2000) 22 Cal. 4th 575. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

*Federal:*

*Amchem Products, Inc. v. Windsor*
  521 US 591, 614 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Arnold v. United Artists Theatre Circuit, Inc.*
  158 F.R.D. 439, 448 (N.D. Cal. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Blackie v. Barrack*
  524 F.2d 891, 901 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 16

*California Rural Legal Assistance v. Legal Services Corp.*
  917 F.2d 1171, 1175 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Consolidated Rail Corp. v. Town of Hyde Park*
  47 F.3D 473, 484 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Eisen v. Carlisle & Jacquelin*
  417 U.S. 156 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*General Tel. Co. v. EEOC*
  446 U.S. 318, 330 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*General Tel. Co. v. Falcon*
  457 U.S. 147, 161 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 18

*German v. Federal Home Loan Mortg. Corp.*
    885 F.Supp. 537, 552 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Hanlon v. Chrysler Corp.*
    150 F.3d 1011, 1020 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 18, 19

*Hanon v. Dataproducts Corp.*
    976 F.2d 497, 508 (9th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Hudson v. Chicago Teachers Union*
    922 F.2d 1306, 1317 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*In re American Medical Systems, Inc.*
    75 F.3d 1069, 1080 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*In re Mego Fin. Corp. Sec. Litig.*
    213 F.3d 454, 462 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Katz v. Carte Blanche Corp.*
    53 F.R.D. 539, 543 (W.D. Penn. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Miller v. Mackey International, Inc.*
    452 F.2d 424 (5th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Mullen v. Treasure Chest Casino, LLC*
    186 F.3d 620, 627 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Rosario v. Livaditis*
    963 F.2d 1013, 1017-1018 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Schwartz v. Harp*
    108 F.R.D. 279, 281 (CD Cal. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Taylor v. Safeway Stores, Inc.*
    524 F.2d 263, 270 (10th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Walling v. Youngerman- Reynolds Hardwood Co.*
    (1945) 65 S.Ct. 1242. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

*Walters v. Reno*
    145 F.3d 1032, 1046 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

iv

*Windham v. American Brands, Inc.*
    565 F.2d 59, 68 (4th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Weyner v. Syntex Corp.*
    117 F.R.D. 641, 644 (N.D. Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

**Secondary Sources**

1 *Newberg* (4th Ed.) § 3:5 at pp. 233-235 and 246-247. . . . . . . . . . . . . . . . . . . . . . . . .16

2 *Newberg* (4th Ed.) § 4.25 at p. 169. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22-23

**Statutes**

29 CFR § 778.110. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

29 U.S.C. §207(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Cal. Labor Code §204. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

Cal. Labor Code §221. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7, 26, 27

Cal. Labor Code §226. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Cal. Labor Code §2802. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7, 26, 27

California law. Wage Order No. 4-2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

F.R. Civ. P. Rule 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Pursuant to Rule 23, Plaintiffs respectfully request Plaintiffs respectfully request an Order certifying the following class:

> All current and former employees in California of Fidelity National Management Services, LLC who held the positions of "Title Officer," "Title Assistant," "Escrow Officer," or "Escrow Assistant," from January 5, 2007 to the present date, whose paychecks listed Fidelity National Management Services, LLC as payor, and who were (1) not provided with wage statements that itemize the components of their commissions and/or bonuses (2) did not receive overtime compensation on their bonuses and/or commissions (3) had deductions made from their commissions as the result of working overtime, (4) had their commissions reduced by the salaries and overtime compensation of their coworkers, (5) worked off the clock  without compensation, and/or (5) missed meal periods.

The Class should be certified because there are common questions of law and fact, the class is sufficiently numerous, the claims of the representative plaintiffs are typical of those of the class, the representative plaintiffs are adequate and have no conflicts with the class, and class counsel is well experienced in similar litigation.

In this case, the Named Plaintiffs and the members of the Class are the current and former employees of the Defendant, Fidelity National Management Services LLC (hereinafter "Fidelity"), as they worked under various brand names under the Fidelity umbrella.  All are classified were classified by Fidelity as non-exempt and were eligible to be paid overtime, and in part by salary, and in part by commissions.

At its core this case deals with the *structure* of Fidelity's pay to its title and escrow employees. (This is not a misclassification case or a pure off-the-clock case; although there is an off-the-clock component of the damages, five of the seven Labor Code violations in this case are apparent from the face of Fidelity's wage statements.) Although the percentage figures varied from brand to brand, the pay structure was similar.  Each employee received a base bimonthly salary which was deducted from a commission (sometimes called a "bonus") which was a percentage of title insurance

4

premiums or escrow fees he or she generated.  If an employee worked and reported overtime, he was paid overtime on the salary component but *not* on the commission --- a violation of both California law and the FLSA.  Any overtime and the base salary was deducted from the commission, so that the payment of overtime even on the base salary was illusory.

Later in the class period, Fidelity set the commission at an absolute 5% cap, which came closer to the salary-plus-overtime total, but then deducted not only the salary and overtime of the employee from this amount but also the salary and overtime of fellow employees in his Unit.  Thus, Fidelity charged an employee for salary and overtime of his co-workers --- another violation of the Labor Code.

These compensation structures present three distinct violations of the labor laws.  Additionally, there are four more: not recording or paying for overtime worked off the clock; deducting losses and expenses on title policies from pay; not itemizing the commission percentage and revenue on which it was based in the wage statements in violation of the wage Order and section 226; and not recording or paying for meal breaks.  It should be noted that while two of the seven violations (off the clock and missed breaks) involve reference to intranet login or other data to calculate damages, the other five violations are apparent from the face of the class members' wage statements.

Defendant Fidelity National Management Services LLC is the employer of every class member, as it is the entity whose name appears on every class members' paycheck as required by Labor Code section 226, regardless of the brand for which the employee worked.  Additionally, defendant Fidelity National Management Services, LLC, is the entity who promulgated the unlawful policies involved in the case, and this entity promulgated the written employment manuals in which these policies are set forth, and which were given to all class members, regardless of the brand they worked for.  Under California law, an "employer" is not merely the entity whose name appears on the paycheck, but is also the entity which sets and controls employment policies and

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION;        Case No.: SACV11-0247
MEMORANDUM OF POINTS AND AUTHORITIES

practices. Thus, while these employees worked under different brand names, all Fidelity employees are paid with similar pay structures and faced with several violations of California law.

**1.   In Violation of the Labor Code §226, Fidelity's Wage Statements Did Not Include the Commission Percentage Rate or Total Revenues on Which It Was Based**

The named Plaintiffs and the other members of the Class were not provided with adequate wage statements that state how their commissions were calculated – that is, the wage statements fail to state the commission rate, the total revenues from which the commission is calculated, or any deductions made from the commissions.  As a result, whether or not the Named Plaintiffs and the Class Members can determine the whether or not their commissions are accurate, in violation of Labor Code §226, is a matter fit for class-wide determination.

**2.   Fidelity Did Not Include the Commissions in Calculating Overtime**

While the Named Plaintiffs and the Class Members were eligible for overtime compensation, a review of their wage statements, clearly indicate that their commission payments were never calculated as part of the "regular rate of pay" for purposes of calculating their overtime compensation, in violation of California law. Wage Order No. 4-2001 (3)(A)(1); 29 U.S.C. §207(e).

**3.   Fidelity Deducted Overtime From Commissions Rending Former Illusory**

For Escrow Officers at Fidelity's brand "Fidelity National Title," as well as Fidelity's Title Officers and Title Assistants, Fidelity not only failed to calculate commissions into overtime compensation, but in fact, deducted the overtime compensation from the commissions it paid to Escrow Officers, Title Officers and Title Assistants.

6

### 4. Fidelity Deducted the Co-Employees' Salaries and Overtime From Employee's Share of Commissions, Thus Forcing Its Employees to Pay Part of Its Business Expenses

Fourth, in 2009, Fidelity further began reducing the commissions earned by its Escrow Officers by not just their own salaries and overtime compensation, but the salaries and overtime compensation of their Escrow Assistants in their escrow unit. Similarly, in 2010, Fidelity changed this policy so that the employees of a Title Unit – a Title Officer and two Title Assistants – could collectively earn no more than 5% of total revenues generated by the Title Unit. As such, the salaries and overtime compensation paid to the coworkers of Title Officers and Title Assistants were also deducted from the commissions paid. Thus, Fidelity's commission pay policies for its Escrow Officers, Title Officers and Title Assistants are in plain violation of Labor Code §§221 and 2802, which prohibit employers from deducting the employers' business expenses from their employees' pay. Moreover, Fidelity deducted losses caused by title insurance claims after the commissions were paid, in violation of §§221 and 2802.

### 5. Fidelity Suffered Its Employees to Work Off the Clock Without Compensation

Fifth, for all Named Plaintiffs and the Members of the Class, working off the clock was a regular occurrence. Where some Named Plaintiffs were told to not report overtime that was not previously approved, one was told by the Senior Vice President (in writing no less) that Fidelity "pays commissions in lieu of overtime." Thus, few, if any of the Class Members reported their actual working hours on their timecards.

### 6. Fidelity Suffered its Employees to Miss Meal Breaks Without Recording These Missed Breaks or Compensating Employees for Them.

Similarly, and sixth, Class Members missed meal periods on a regular basis, but were encouraged to report taking meal periods, even when it was obvious to Fidelity that the meal periods were missed.

7

1    These claims all are the result of Fidelity's policies, practices and procedures that

2    span all of its individual "brands."  Therefore, the issue of Fidelity's wage statements,

3    its calculation of overtime compensation, deductions from the pay of the Title Officers

4    and Title Assistants, as well as the off the clock work, and the missed meal periods are

5    all suitable for class-wide determination. The Court should certify the Class.

6    **II.    APPLICABLE LAW TO CLASS CERTIFICATION**

7    FRCP Rule 23(c)(1) provides:

8    As soon as practicable after the commencement of an action brought as a
     class action, the court shall determine by order whether it is to be so
9    maintained. An order under this subdivision may be conditional, and may
     be altered or amended before the decision on the merits.
10

11   The party moving for class certification has the burden of proving that the class

12   satisfies the prerequisites and a class action ground set forth in FRCP Rules 23(a) and

13   (b). *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992).

14   Although the Court must engage in a rigorous analysis to determine whether all

15   the prerequisites of Rule 23(a) are satisfied (*General Tel. Co. v. Falcon*, 457 U.S. 147,

16   161 (1982)), an extensive evidentiary showing is not required. *Blackie v. Barrack*, 524

17   F.2d 891, 901 (9th Cir. 1975). All that is necessary is sufficient information for the

18   court "to form a reasonable judgment on each requirement." *Id*. The court does not

19   examine the merits of the case, and must accept as true the substantive allegations of the

20   class claim. *Id*. at n.17. The procedures governing federal class actions under Rule 23 do

21   not permit inquiries into the merits of class claims for relief. In *Eisen v. Carlisle &*

22   *Jacquelin*, 417 U.S. 156 (1974), the Supreme Court explained that "nothing in either the

23   language or history of Rule 23 . . . gives a court any authority to conduct a preliminary

24   inquiry into the merits of a suit in order to determine whether it may be maintained as a

25   class action." 417 U.S. at 177. This also prevents the inequitable practice of "one-way

26   intervention"; *i.e.*, unnamed class members cannot opt-out of any suit in which the

27

28                                              8

1    merits are decided adversely to their interests. *See Hudson v. Chicago Teachers Union*,

2    922 F.2d 1306, 1317 (7th Cir. 1991).

3         In *Eisen*, the High Court expressed its agreement with *Miller v. Mackey*

4    *International, Inc.*, 452 F.2d 424 (5th Cir. 1971), which held that a trial court should not

5    consider the substantive merits of a claim for relief when passing on a motion for a class

6    action. In *Miller*, the Court emphasized that the propriety of a class action is "basically a

7    procedural question" and that "[a] suit may be a proper class action, conforming to Rule

8    23, and still be dismissed for failure to state a cause of action." 452 F.2d at p. 427. The

9    Supreme Court concluded in *Eisen*:

10
11         In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.
12         *Eisen*, 417 U.S. at 178 (*quoting Miller*, 452 F.2d at 427.

13         While plaintiff believes he will most certainly prevail on the merits, this motion

14    appropriately focuses on the satisfaction of the requirements of Rule 23.

15    **III.**      **SUMMARY OF FACTS**

16         Fidelity owns and operates several "brands" of title companies that operate under

17    the names of "Lawyers Title," "Fidelity National Title," "Chicago Title,"

18    "Commonwealth Land Title" and "Ticor."  (Decl. of Treglio at Exh. 1, Fidelity

19    Employment Manual at p. 5-6; Decl. of Treglio at Exh. 2: Depo. Williams at 11:5-

20    13:10, 15:1-9).  There are 276 offices operated by Fidelity under these various names.

21    (Decl. of Treglio at ¶¶6-10).  These brands, in turn, "employ" Title Officers, Title

22    Assistants, Escrow Officers and Escrow Assistants for the provision of services

23    connected with either the sale or refinancing of real estate.  (Decl. of Treglio at Exh. 1).

24    Regardless of which brand Title Officers, Title Assistants, Escrow Officers and Escrow

25    Assistants obstensibly work for, all Title Officers, Title Assistants, Escrow Officers and

26    Escrow Assistants are paid directly by Fidelity. (Decl. of Treglio at Exhibits 3-5), they

27    operate under Fidelity's policies, practices and procedures. (Decl. of Treglio at Exh. 1,

28

9

Fidelity Employment Manual at p. 5-6; Decl. of Treglio at Exh. 2: Depo. Williams at 11:5-13:10, 15:1-9).

Prior to 2008, Lawyers Title, Ticor, and Commonwealth Land Title were owned and operated by LandAmerica. Within a few years of its formation, LandAmerica became insolvent, and its operations in California were purchased by Fidelity in January of 2009. (Decl. of Treglio, Exh. 6, Depo. of Burda at 46:21-47:4). Thereafter, Fidelity changed a number of policies, installed a new employee manual, changed the pay for Title Officers and Title Assistants, and installed a company-wide intranet (Decl. of Treglio, Exh. 2, Williams Depo at 74:5-25, 84:23-85:18; Exh. 6, Burda Depo at 47:5-14).

In operation, the Fidelity branches are all broken up in to Title Units and Escrow Units. (Decl. of Burda at ¶3; Decl. of Hess at ¶3; Decl. of Palazzo at ¶3; Decl. of Erwin at ¶3). Title Units are typically made up of one or more Title Officers, and two or more Title Assistants. (Id.) Escrow Units are made up of one or more Escrow Officers and two or more Escrow Assistants. (Id.) The Title Units' duty is to create title insurance policies for various real estate transactions, and the Escrow Units' duty is to guide real estate transactions through escrow. All Title Officers, Title Assistants, Escrow Officers and Escrow Assistants are classified as non-exempt, and are eligible for overtime compensation. (Decl. of Treglio at Exh. 2, Williams Depo at 28:14-29:5). Additionally, all Title Officers, Title Assistants, Escrow Officers and Escrow Assistants receive commissions based upon the revenue they generate in their respective Title and/or Escrow Units. (Id.)

It is how Fidelity's employees are paid in these job titles is the essence of Plaintiffs' claims in this case. Fidelity's methodologies for paying of overtime violate California labor laws in different ways. For Class Members in the Escrow Unit at "Lawyers Title," Fidelity pays a salary and commissions (also called bonuses). (Decl. of Treglio at Exh. 7 and 8, Commission Agreements with Palazzo and Erwin).

10

1    However, until recently, when an Escrow Officer or an Escrow Assistant works long

2    enough to receive overtime compensation, the commissions earned by those employees

3    are used or included in the calculation of the overtime hourly rate. (Decl. of Treglio at

4    ¶¶17-21, Exh. 9-13).  And, in fact, according to the wage statements of Joyce Schemel,

5    Lori Callison, Candee Erwin, and Shirley Palazzo, the pay rate for overtime

6    compensation remains the same, no matter how much is paid in commissions for that

7    pay period.  (Id.) Moreover, Class Members who worked in the Escrow Unit were told

8    repeatedly to not put down their overtime hours. (Decl. of Callison at ¶6; Decl. of

9    Schemel at ¶4; Decl. of Erwin at ¶5; Decl. of Palazzo at ¶5).  Indeed, Karen Robertson,

10   the Senior Vice President of Fidelity told Joyce Schemel in an email, "commissions are

11   paid in lieu of overtime." (Decl. of Schemel, Exh. A).

12           Starting in February of 2009, Fidelity began reducing the commissions earned by

13   Escrow Officers at Fidelity's brand, "Fidelity National Title," by both the salary and

14   overtime of the Escrow Officers themselves, and by the salary and overtime

15   compensation paid to the Escrow Assistants who worked underneath them.  (Decl. of

16   Callison at ¶4; Decl. of Treglio at Exh. 19, Email from Dawn Contreras).  As a result,

17   many Escrow Officers told their assistants to not report any overtime.  (Decl. of Treglio

18   at Exh. 19, Email from Dawn Contreras).

19           Similarly, employees in the Title Unit faced the same Fidelity's policies.  Prior to

20   February of 2010, commissions were paid in lieu of overtime, and any overtime claimed

21   would be deducted from the commissions.  (Decl. of Hess at ¶5; Decl. of Burda at ¶5).

22   Starting in February of 2010, Fidelity instituted a policy company-wide which capped

23   payments to employees in Title Units to five percent of the revenue the Title Unit

24   produced for that month.  (Decl. of Treglio, Exh. 2, Depo. Williams at 74:5-25).  Under

25   the terms of this policy (Decl. Treglio at Exh. 14, Title Officer Bonus Agreement), five

26   percent of the revenue produced by the Title Unit is set as the amount to be paid in

27   commissions to the members of the Title Unit, divided between the Title Officer and the

28                                              11

Title Assistants based upon an agreed upon percentage.  (Id.).  But the salaries and

overtime compensation of everyone in the unit **are deducted from the five percent of

revenue**.  Everyone is then paid the remainder in commissions.  In other words, no

matter how many hours the employees in the Title Unit work, they will not be paid

more than 5% of the revenue received by the Title Unit.  (Decl. Treglio at Exh. 2, Depo.

Williams at 58:6-60:8).  At best, an employee in the Title Unit can increase their

percentage of the 5% cap by reporting more overtime, thereby decreasing the available

amount of money for commissions paid to everyone else in the Unit.  Additionally,

Fidelity if someone in the Title Unit makes a mistake, and causes a title insurance claim

to be filed, loss caused by the claim will be deducted from the commission pool. (Decl.

Treglio at Exh. 14, Title Officer Bonus Agreement). Moreover, commissions received

by Title Officers and Title Assistants were never calculated into their overtime

compensation. (Decl. of Treglio, ¶¶17 and 21, Exh. 9 and 13).

     Thus, there was no economic incentive for employees to record overtime.  As

long as the overtime pay plus base pay was less than the commission (which was true

especially before the 5% total cap went into effect, even when there were many

overtime hours) an employee's compensation did not change if he did or did not report

the overtime.  (This is what is meant by the overtime being "illusory;" a senior Fidelity

Management employee confessed as much to a class representative when the former

wrote that "commissions are paid in lieu of overtime.")

     As a result of these policies, Fidelity's employees do not always report all of

their overtime hours.  In some instances, employees corroborate on filling out their

timecards to prevent one person from reporting too much overtime.  (Decl.  Burda at

¶6).  Moreover, reporting too much overtime can be grounds for termination. (Decl.

Treglio at Exh. 15).  Prior to February 2010, Title Assistants and Title Officers regularly

did not report any overtime – after all, there was no economic incentive to do so as they

12

1   would not be compensated for it.  After 2010, Title Officers and Title Assistants would

2   report their overtime, but only as a way to increase their share of the 5% cap.

3          For all the Class Members, the wage statements reporting on commissions are

4   identical.  (Decl. Treglio at Exh. 3-5).  In each instance, the wage statement has a line

5   that shows the total amount paid in commissions, but does not include the total revenue

6   earned during the pay period, the commission rate, or any deductions from the

7   commissions paid.  (Decl. of Treglio at Exh. 2, Depo. Williams at 50:20-51:25).  From

8   the face of the wage statement, there is no way of knowing how Fidelity calculated the

9   commission, and there is no way for the employee to determine if the commission

10   payment is accurate. (Id.)  This is in violation of Labor Code §226 (see below).

11         Lastly, few, if any Fidelity employees took meal or rest periods.  (Decl. Burda at

12   ¶9; Decl. Callison at ¶7; Decl. Schemel at ¶5; Decl. Erwin at ¶6; Decl. of Hess at ¶8;

13   Decl. of Palazzo at ¶7).  In part, this was due to the business they were in – because wire

14   transfers had to be completed by 2:00 p.m. Pacific Standard Time, most employees in

15   the Escrow and Title Units would work through lunch.  (Id.).  Despite this, Class

16   Members were directed to report they took lunch periods.  (Id.)  Even this was

17   problematic.  Ms. Palazzo, for instance, always reported taking a lunch period in her

18   sixth hour of employment, but was never compensated for a late meal period. (Decl.

19   Treglio at Exh. 16, Palazzo Timesheets).

20         **A.**    **THE CLASS REPRESENTATIVES**

21          Plaintiff Laurel Hess has been employed by Fidelity as a Title Assistant since

22   January of 2009, when Fidelity purchased Lawyers Title.   (Decl. of Hess at ¶2).  For

23   the first year of her employment, Laurel Hess was informed that any overtime she

24   claimed would be deducted directly from her commissions.  (Decl. Hess at ¶5).  As

25   such, she never claimed any overtime during the first year of her employment with

26   Fidelity.  (Decl. of Treglio at Exh. 17).  In February of 2010, Hess' compensation

27   changed consistent with the five percent cap rule described above.  (Decl. of Hess at

28                            13

¶6).  In response, Ms. Hess began reporting her overtime. (Decl. of Hess at ¶6; Decl. of Treglio at Exh. 17).  Her commissions were never calculated into her overtime compensation.  (Decl. of Treglio at ¶21 and Exh. 13).  Additionally, Laurel Hess regularly misses meal and rest periods, but never claims it because she was told by an Human Resources person to report taking meal periods whether she takes them or not. (Decl. Hess at ¶8).  While her wage statements state the amount of commissions paid to her, they do not state how those commissions were calculated.  (Decl. of Hess at ¶7).

Plaintiff James Burda was employed by Fidelity as a Title Officer from January of 2009 until August of 2010.  (Decl. of Burda at ¶2).  Like Ms. Hess, James Burda was told to that his overtime compensation would be deducted from this commissions, and so never claimed any overtime on his time cards. (Decl. of Burda at ¶5; Decl. of Treglio at Exh. 18).  In April of 2010, two months after he became subject to Fidelity's five percent cap for Title Unit employees, he began reporting the overtime hours he worked. (Decl. of Burda at ¶6; Decl. of Treglio at Exh. 18).   In August of 2010, he was fired for claiming "excessive overtime." (Decl. of Treglio at Exh. 15).  His commissions were never calculated into his overtime compensation.  (Decl. of Treglio at ¶17, Exh. 9). Additionally, James Burda regularly missed meal and rest periods, but never claimed it because he was told by an Human Resources person to report taking meal periods whether he took them or not. (Decl. of Burda at ¶9).  While his wage statements state the amount of commissions paid to him, they do not state how those commissions were calculated.  (Decl. of Burda at ¶7).

Shirley Palazzo and Candee Erwin worked for Fidelity as an Escrow Assistant and Escrow Officer, respectively.  (Decl. of Erwin at ¶2; Decl. Palazzo at ¶2).  Both were paid in part by commission and in part by salary.  Nonetheless, their commissions were never used to calculate their overtime compensation. (Decl. of Erwin at ¶9; Decl. Treglio at ¶18, Exh. 10)  The basis for the commissions were also not reported in their wage statements (Decl. of Treglio at Exh. 2, Depo. Williams at 50:20-51:25).   Both

14

were informed that they were not to report any overtime worked unless given prior approval by their supervisors. (Decl. of Erwin at ¶5; Decl. Palazzo at ¶5).   As a result, neither reported much of the overtime they worked. (Id).  Similarly, both were told to report they took meal periods whether they took them or not. (Decl. of Erwin at ¶6; Decl. Palazzo at ¶6).

Joyce Schemel worked for Fidelity as an Escrow Assistant for Fidelity under the Fidelity National Title brand.  (Decl. of Schemel at ¶2).  She was paid in part by commission and in part by salary and overtime, but her commissions were not calculated into her overtime compensation.  (Decl. of Treglio at ¶19 and Exh. 11).  The basis for her commissions were never reported on her wage statements. (Decl. of Treglio at Exh. 2, Depo. Williams at 50:20-51:25).  She was informed by her supervisors that she was not to report any overtime because Fidelity pays commissions in lieu of overtime. (Decl. of Schemel, Exh. A).

Lori Callison worked for Fidelity as an Escrow Officer under both the Commonwealth Land Title and Fidelity National Title Brands. (Decl. of Callison at ¶2). She was paid in part by commission and in part by salary and overtime, but her commissions were not calculated into her overtime compensation.  (Decl. of Treglio at ¶20 and Exh. 12).  As with Jim Burda and Laurel Hess, in 2009 Fidelity began reducing her commissions by any overtime she claimed, along with the salaries and overtime compensation of her escrow assistants. (Decl. Callison at ¶4).  While Ms. Callison worked overtime on a regular basis, as is required by the position of Escrow Officer, she rarely reported her overtime hours because she was told not to. (Decl. of Callison at ¶¶5 and 6).  Nor would Ms. Callison take meal periods, despite reporting that she did so. (Decl. of Callison at ¶7).

## IV.  THE CLASS MEETS ALL THE REQUISITES FOR CERTIFICATION UNDER FRCP RULE 23.

### A.  SUMMARY OF LAW

15

The burden is on the party seeking to maintain the action as a class action to establish a prima facie showing of each of the 23(a) prerequisites and the appropriate 23(b) ground for a class action. *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 270 (10th Cir. 1975). In evaluating whether plaintiffs have met their burden, the court should accept the substantive allegations of the complaint as true. *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975).

At the certification hearing, the court looks to the pleadings and may consider extrinsic evidence to determine whether the Rule 23 requirements are met. *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3D 473, 484 (2nd Cir. 1995). To be certified, a class action must satisfy the four prerequisites of typicality, commonality, numerosity, and adequacy of representation. See F.R.Civ.P. Rule 23(a). Following satisfaction of the Rule 23(a) requirements, a plaintiff must additionally satisfy one of the criteria contained in F.R.Civ.P. Rule 23(b) – ordinarily either "superiority" (Rule 23(b)(1)) or "predominance" (Rule 23(b)(3)).  Here, the class meets all the prerequisites of F.R.Civ.P.  Rule 23(a), as well as 23(b)(1) *and* 23 (b)(3).

**B.  STEP ONE: RULE 23(a)**

1.  <u>The Class is so Numerous That Individual Adjudication is Impractical</u>

Numerosity does not require that joinder of all members be impossible, but only that joinder be impracticable. *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994); FRCP Rule 23(a)(1); *See also*, *German v. Federal Home Loan Mortg. Corp.*, 885 F.Supp. 537, 552 (S.D.N.Y. 1995). Plaintiff does not need to state the exact number of potential class members, nor is a specific number of class members required for numerosity. 1 *Newberg* (4th Ed.) § 3:5 at pp. 233-235 and 246-247; *Arnold*, 158 F.R.D. 439; rather, whether joinder is impracticable depends on the facts and circumstances of each case. *General Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980); *Schwartz v. Harp*, 108 F.R.D. 279, 281 (CD Cal. 1985). Although the total number of individuals in the Class is unknown (and is the subject of a motion to compel

16

1    to be heard the day after this motion is filed), a review of the Fidelity's websites

2    indicate that the Defendant operates 276 offices in the state of California under the

3    names of "Fidelity National Title," "Chicago Title," "Lawyers Title," "Commonwealth

4    Title" and "Ticor."  (Decl. of Treglio at ¶¶6-10).  Assuming that each office contains at

5    least one Title Unit (1 Title Officer and 2 Title Assistants), and one Escrow Unit (1

6    Escrow Officer and 2 Escrow Assistants), there are over 1,600 persons in the Class.

7    Thus, joinder is impracticable, demonstrating the substantial benefit of class treatment

8    and an extraordinary likelihood that a denial of certification will, as a practical matter,

9    result in the loss of the claims of thousands of under-represented workers.

10   2.      The Proposed Class Representative will Adequately Represent the Class.

11          Rule 23(a)(4) requires that the proposed representative does not have conflicts of

12   interest with the proposed class and that the representative is represented by qualified

13   counsel. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *Walters v.*

14   *Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998). Mere divergence of opinion between the

15   class and its representative(s) is not sufficient. *In re Mego Fin. Corp. Sec. Litig.*, 213

16   F.3d 454, 462 (9th Cir. 2000).

17          In this case, there is no evidence of antagonism between the proposed

18   representatives, or their attorneys, and the putative class and, even if there were, any

19   class member who wishes to "opt out" of the class will be afforded an opportunity to do

20   so. Moreover, Plaintiffs' attorneys are experienced class action litigators in a firm

21   highly trained in the prosecution of wage and hour class actions such as this.   See Decl.

22   of David R. Markham.  Plaintiffs and their counsel are willing to pursue this action

23   vigorously on behalf of the class, have thoroughly investigated the claims of the class,

24   and have engaged in the needed certification discovery of employment litigation,

25   "including document requests and production, interrogatories, and the taking and

26   defending of depositions." *Hanlon*, 150 F.3d at 1022.

27   3.      The Proposed Class Representative's Claims are Typical of That of the Class

28                                              17

Rule 23(a)(3) requires typicality, which the Ninth Circuit also interprets permissively. *Hanlon*, 150 F.3d at 1020. Typicality requires that the named plaintiff be a member of the class he represents and "possess the same interest and suffer the same injury" as class members. *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982). The named plaintiff's claims need not be identical to the claims of the class to satisfy typicality; rather, the claims are typical if they are "reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020. It is sufficient for plaintiffs' claims to "arise from the same remedial and legal theories" as the class claims. *Arnold*, 158 F.R.D. at 449; *California Rural Legal Assistance v. Legal Services Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990) [class representatives and members of the class need only "share a common issue of law or fact"].

Moreover, Rule 23's typicality and commonality (*discussed, infra*) requirements "tend to merge," and a finding of commonality ordinarily will support a finding of typicality. *Falcon*, 457 U.S. at 157 n.13; *Weyner v. Syntex Corp.*, 117 F.R.D. 641, 644 (N.D. Cal. 1987) [observing a "necessary overlap of the provisions of Rule 23"]; *California Rural Legal Assistance*, 917 F.2d at 1175 [Rule 23 "does not require the named plaintiffs to be identically situated with all other class members. It is enough to share a 'common issue of law or fact.'"].

As noted in the Statement of Facts section above, the Plaintiffs were all (1) employed by Fidelity, (2) received wage statements that did not state the basis for the commissions they received, (3) were paid overtime compensation that did not include their commissions and/or bonuses, (4) worked off the clock at the direction of Fidelity management, and (5) missed meal periods.  (Decl. of Burda, Callison, Schemel, Erwin, Palazzo, and Hess.)  Additionally, Plaintiffs Erwin Burda and Hess, as an Escrow Officer, Title Officer and Title Assistant, respectively, were subject to deductions to their pay as a result of the five percent cap policy, and as a result, were denied overtime compensation based on their regular rate of pay.

18

4.    Common Questions of Law Exist Between Plaintiff and the Class.

The common nucleus of operative facts here is whether the Plaintiffs and the Class Members were (1) employed by Fidelity (2) provided inaccurate wage statements, (3) were paid compensation for overtime hours that not did not include payments for commissions, (4) had deductions made to their commissions based on the salaries and overtime compensation of other employees (for the Title Officer and Title Assistant Subclasses only), (5) had deductions made to their pay for losses, (6) worked off the clock at the direction of Fidelity management, and (7) were denied meal periods. So long as class members assert a common complaint and demonstrate they are subject to the same harm, commonality exists.  The pleadings and evidence in this case are crystal clear that the alleged harm applies commonly to each member of the class. The Ninth Circuit construes the commonality prerequisite permissibly.  *Hanlon v. Chrysler Corp.*, 150 F.3d at 1019. All questions of law and fact need not be common. *Id.* Rather, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.*

All of these are common questions of law and/or fact as to each and every class member.  While the putative class here enjoys several common questions of law and fact, there "need be only a single issue common to all members of the class" to meet the commonality requirement. *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996). A common nucleus of operative facts alone is usually enough to satisfy the commonality requirement of Rule 23(a)(2). *Rosario v. Livaditis*, 963 F.2d 1013, 1017-1018 (7th Cir. 1992); see also *Hanlon v. Chrysler*, 150 F.3d at 1019 [common question requirement can be satisfied either by a shared legal issue with divergent factual predicates or by a common core of salient facts with disparate legal remedies.]

**C.    STEP TWO: RULE 23(b)**

Once a plaintiff has satisfied the Rule 23(a) preliminary requirements of numerosity, commonality, typicality, and adequacy of representation, he must

19

demonstrate that the proposed class action qualifies under one of the sub-sections of Rule 23 (b). In this case, plaintiff has sought certification under Rule 23 (b)(1) and Rule 23 (b)(3). Though plaintiff can satisfy both elements, it is sufficient for certification that he satisfy only *one*.

1.  <u>Class Adjudication Is Superior To All Other Forms</u>.

Under Rule 23 (b)(1), a plaintiff must establish, "that class action treatment is the preferable method of handling a case." This is shorthand for the actual rule, which states that Class Actions are appropriate when: (1) the prosecution of separate actions by or against individual members of the class would create a risk of:

> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, **or**
> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Rule 23 (b)(1)(A-B).

Basically, what the so-called Superiority element represents is the principle that Class adjudication is appropriate when prosecution of individual actions might lead, from case to case, to contradictory results, prejudicing the interests of either the defendant or members of the plaintiff's class. "To illustrate: separate actions by individuals against a municipality to declare a bond issue invalid or condition or limit it, to prevent or limit the making of a particular appropriation or to compel or invalidate an assessment, might create a risk of inconsistent or varying determinations." See *Notes of Advisory Committee on 1966 Amendments*.  Though the facts of liability are no different, different courts adjudicating the matter might reach conflicting conclusions.

Here, the consequences of varying outcomes are undesirable.  This risk alone warrants certification so that the determination can be made once and for all and will bind all of the parties. *Amchem Products, Inc. v. Windsor* , 521 US 591, 614 (1997) [Rule 23(b)(1)(A) is satisfied "where the party is obligated by law to treat the members

20

1   of the class alike, or where the party must treat all alike as a matter of practical

2   necessity."]. Applicability of an "exemption" to an entire class of employees performing

3   the same functions should not be determined on a piecemeal basis.

4          Moreover, as a matter of public policy, class-wide adjudication of these claims is

5   consistent with California's goal of ensuring the well-being of the worker and the

6   worker's family. The Labor Code sections at issue here, concerning the way an

7   employer pays its employees are minimum labor standards. When they are violated on

8   an individual basis, the employer's successful violation only encourages further

9   violations. Attacking the violation individually simply does not address the problem.

10  When the violation is the same for all of defendant's employees, the superior method of

11  adjudication is not an individual action, but class wide adjudication. This ensures that

12  the State's important public policy, and the rights of hundreds of workers and their

13  families, can be vindicated, the violation corrected, and the law enforced. As noted by

14  the Court in *Katz v. Carte Blanche Corp.* (W.D. Penn 1971) 53 F.R.D. 539, 543:

15         [I]t must be remembered that the foundation of a class action is that it is "a
           semi-public remedy administered by the lawyer in private practice".
16         (Kalven and Rosenfield, The Contemporary Function Of The Class Suit, 8
           U.Chi.L.Rev. 684, 717 (1941)). It is often the only practical effectuation of
17         remedial provisions of legislative policies. The action of Federal agencies
           entrusted with the enforcement of public policy is limited to compelling
18         compliance with a statute.

19         There can be no more appropriate use of the Class Action form than in the

20  prosecution of a case involving the violation of important California public policies

21  impacting the rights of hundreds of individuals who were subject to the same treatment

22  by Fidelity.

23  2.     Issues Common To The Class Predominate Over Individual Issues

24         As an alternative to FRCP Rule 23(b)(1), under Rule 23(b)(3), a plaintiff must

25  establish that the questions common to the class predominate over the questions

26  affecting individual members. As noted by the Advisory Committee on the 1966

27  Amendments,

28                                            21

> Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. The Court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the questions affecting individual members. It is only where this predominance exists that economies can be achieved by means of the class-action device.

Under Rule 23(b)(3), the moving party must demonstrate that common questions "predominate over any questions affecting only individual members" and that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." More plainly stated, F.R.Civ.Pro. Rule 23(b)(3) "focuses on the relationship between common and individual issues." *Wang*, 231 F.R.D. at 613 [finding common questions of law and fact to predominate in an overtime misclassification case]; *See also*, *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 627 (5th Cir. 1999) [predominance is determined not by counting the number of common issues, but by weighing their significance]. As explained in Newberg's treatise, while the meaning of "predominance" has remained enigmatic, at least "[m]ost courts have agreed on what the predominance test does not entail." 2 *Newberg* (4th Ed.) § 4.25 at p. 169. Specifically, as Professor Newberg explains:

> The test was not meant to require that the common issues will be dispositive of the controversy or even be determinative of the liability issues involved. ... In addition, the predominance requirement is not a numerical test that identifies every issue in the suit as suitable for either common or individual treatment and determines whether common questions predominate by examining the resulting balance on the scale. A single common issue may be the overriding one in the litigation, despite the fact that the suit also entails numerous remaining individual questions. ... In finding that common questions do predominate over individual ones in particular cases, courts have pointed to such issues that possess the common nucleus of facts for all related questions, have spoken of a common issue as the *central* or *overriding* question, or have used similar articulations. ... Implicit in all these articulations of satisfaction of the predominance test is the notion that adjudication of the common issues of the particular suit has important and desirable advantages of judicial economy compared to all other issues, or when viewed by themselves. 2 *Newberg* (4th Ed.) § 4.25 at pp. 169-174.

22

1  As noted above, there are seven issues of common fact and law: whether the Plaintiffs

2  and the Class Members were (1) employed by Fidelity (2) provided inaccurate wage

3  statements, (3) were paid compensation for overtime hours that not did not include

4  payments for commissions, (4) had deductions made to their commissions based on the

5  salaries and overtime compensation of other employees (for the Title Officer and Title

6  Assistant Subclasses only), (5) had deductions made to their pay for losses, (6) worked

7  off the clock at the direction of Fidelity management, and (7) were denied meal periods.

8         **a.     The Plaintiffs and the Class Members Worked for Fidelity**

9        Defendant has argued, and will argue, that Plaintiffs, and other members of the

10  Class, all worked for different "brands," and that each office is run completely different

11  from every other office.  Thus, the question of who employs the Plaintiffs and the Class

12  Members is a common question of fact and law.

13        Under California law, an employer is defined as "any person as defined in

14  Section 18 of the Labor Code [which defines corporate entities like Fidelity as persons],

15  who directly or indirectly, or through an agent or any other person, employs or exercises

16  control over the wages, hours, or working conditions of any person."  California

17  Industrial Wage Order No. 4-2001 (2)(H). The California Supreme Court in *Martinez v.*

18  *Combs* (2010) 49 Cal. 4th 35, 64, held:

19          As defined in the wage orders, " '[e]mployer' means any person … who

20       … *employs* or exercises control over the wages, hours, or working
     conditions of any person," and " '[e]*mploy'* means to *engage*, suffer, or

21       permit to work." (Wage Order No. 14, Cal. Code Regs., tit. 8, § 11140,
     subd. 2(C), (F), italics added.) The verbs "to suffer" and "to permit," as

22       we have seen, are terms of art in employment law. (See, *ante*, at p. 57 et
     seq.) In contrast, the verb "to engage" has no other apparent meaning in

23       the present context than its plain, ordinary sense of to employ," that is, to
     create a common law employment relationship. . . To employ, then. . .

24       .has three alternative definitions. It means: (a) to exercise control over the
     wages, hours or working conditions, *or* (b) to suffer or permit to work, *or*

25       (c) to engage, thereby creating a common law employment relationship.

26  Thus, under California law, Fidelity is clearly the employer of the Class Members. The

27  Plaintiffs, regardless of the brand they "worked for," all received wage statements

28                             23

1  reciting Fidelity as their employer.  (Decl. of Treglio at Exh. 3-5).  The employee

2  manual produced by Fidelity in discovery in response to Plaintiffs request for the

3  employment policies as they related to the Plaintiffs was written by Fidelity.  (Decl. of

4  Treglio at Exh. 1).  When asked for the employment files of the Plaintiffs, Fidelity

5  produced them.  (Decl. of Treglio at Exh. 20).  The termination forms used for James

6  Burda, and Shirley Palazzo were both written by Fidelity.  (Decl. of Treglio at Exh. 15

7  and 21).  Dan Williams, the County Manager for "Lawyers Title," testified that his

8  direct supervisors are employed by Fidelity, and also stated when Fidelity purchased

9  Lawyers Title, it implemented a number of changes affecting the employment of the

10  Class Members.  (Decl. of Treglio at Exh. 2, Depo. of Williams at 74:5-25, 84:23-

11  85:18).

12         **b.  Plaintiffs and the Class Members Received Inadequate
       Wage Statements in Violation of Labor Code §226**

13       As noted in the Deposition of Dan Williams, the wage statements, exemplars of

14  which are found at Exh. 3, 4 and 5 to the Treglio Decl., all have the same format.  As

15  the Court can see, the wage statements provide a line item called "commissions" which

16  solely provide the total amount of commissions earned during the pay period.  ((Decl. of

17  Treglio at Exh. 2, Depo. of Williams at 50:20-51:25).  There is no line item as to the

18  amount of sales subject to commission or what the commission rate is.  There is no line

19  item of what the deductions are (only a net, total "commission" number is provided)

20  and, indeed, the word "deduction" is not mentioned at all.   Plaintiffs' contention is that

21  these wage statements violate the requirements of Cal. Labor Code section 226.

22  Specifically, section 226 requires:

24       (a) Every employer shall, semimonthly or at the time of each payment of
      wages, furnish each of his or her employees . . . .an itemized statement in

25       writing showing (1) gross wages earned, . . . . (3) the number of piece-rate
      units earned and any applicable piece rate if the employee is paid on a

26       piece-rate basis, (4) all deductions, provided, that all deductions made on
      written orders of the employee may be aggregated and shown as one item.

27       . . .(9) all applicable hourly rates in effect during the pay period and the

28                               24

corresponding number of hours worked at each hourly rate by the employee.

Further, Section 7(A)(6) of the Industrial Wage Orders expands the requirements of section 226 to employees paid by commission so that every wage statement must state the total sales upon which the commissions are based and the rate of commissions, which do not appear on any of Fidelity's wage statements.

### c.   Fidelity's Failure to Base its Overtime Compensation on Plaintiffs' Commissions (As Well As On Their Salaries)

As stated above, no matter the position, or the office where the Plaintiffs worked, the commissions earned by the Class Members were never calculated into the overtime compensation earned.   (Decl. of Treglio at ¶¶17-21; Exh. 9-13). This practice is unlawful under both California and Federal law, as both California and Federal law require that an employee who works overtime be paid one and a half time the employee's regular rate of pay.  Wage Order No. 4-2001 (3)(A)(1); 29 U.S.C. §207(e). The United States Supreme Court in *Walling v. Youngerman- Reynolds Hardwood Co*. (1945) 65 S.Ct. 1242, 1245 further held:

> The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments. It is not an arbitrary label chosen by the parties; it is an actual fact. Once the parties have decided upon the amount of wages and the mode of payment the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary 'regular rate' in the contracts." (See also, *Walling v. Alaska Pacific Consolidated Mining Co.* (9th Cir.1945) 152 F.2d 812, 815)

For each of the named Plaintiffs and the Class Members, commissions, or bonuses, represent one part of their regular compensation, and as such, must be included in any calculation for overtime compensation. 29 CFR § 778.110; See also California Department of Labor Standards and Enforcement Manual, Computation of Regular Rate of Pay and Overtime, §49.  These authorities state that an employer must calculate the hourly rate of commissions earned per pay period (by dividing the commissions by the

25

hours worked), and then paying the employee one-half the commission hourly rate for every overtime hour worked.  Id.  Had Fidelity compiled with the law, the hourly rates of the Named Plaintiffs for overtime compensation would have fluctuated for each pay period.  It did not.  (Decl. of Treglio at ¶¶17-21, Exh. 9-13).

      **d.**    **Unlawful Deductions From Pay For Escrow Officers, Title Officers and Title Assistants**

As stated above, in February of 2009, Fidelity instituted a policy for its Escrow Officers at it "Fidelity National Title" brand offices wherein the salary and overtime compensation of the Escrow Officer's assistants is deducted from the commission of the Escrow Officer.  (Decl. of Callison at ¶4; Decl. of Treglio at Exh. 19).  Similarly, in 2010, Fidelity implemented a five percent cap on the compensation paid to Title Unit employees at "Lawyers Title," such as Title Officers and Title Assistants.  (Decl. of Treglio, Exh. 2, Depo. Williams at 74:5-25).  As with the policy for Escrow Officers at "Fidelity National Title," Fidelity deducts from the commissions paid both the salary and overtime compensation that each Title Officer or Title Assistant work, and the salary and overtime compensation that other members of the Class Members' Title Unit worked.  In addition to not including commissions into overtime compensation, Fidelity also deducts from these commissions in violation of California law.

Because the commissions policy affects compensation for commissions that have already been paid, Section 221 states, "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."  The California Supreme Court, in *Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal. 2d 319, 327-328, held that Labor Code §221 cannot deduct moneys paid to an employee absent a showing of malfeasance by the employee. Moreover an employer cannot deduct wages of an employee to cover its own business expenses.  Per the Code:

An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of

26

the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful.

Labor Code §2802 (a); See *Gattuso v. Harte-Hanks Shoppers, Inc.* (20087) 42 Cal. 4th 554, 561-64 (explaining the history of §2802); *See also Grissom v. Vons Companies, Inc*. (1991) 1 Cal. App. 4th 52, 59-60.

Here, Fidelity took money from the amount it agreed to pay its employees not because the employees were malfeasant, but because they were working to generate the revenue from which Fidelity generated income.  Fidelity required the employees to pay for its own business expenses, in violation of section 221.  Moreover, not only are such deductions unlawful under Labor Code section 221, they are also unlawful under Labor Code §2802, which requires employers to reimburse their employees for all expenses (such as their own labor and the labor costs of their co-workers) incurred their employment.

### e.    Plaintiffs and Other Class Members Worked Off the Clock

The testimony of all the Named Plaintiffs is the same – all worked "off the clock," that is, each testified that they worked for a number of hours and did not report those hours to Fidelity.  However, Cal. Labor Code §204 requires that non-exempt employees be compensated for all the hours that they work.  Plaintiffs contend that Fidelity's policies, not the individual choices of the Plaintiffs, resulted in the off-the-clock violations.  The California Supreme Court in *Morillon v. Royal Packing Company* (2000) 22 Cal. 4th 575, 584-5, explained thusly:

> [T]he phrase "suffered or permitted to work, whether or not required to do so" (subd. 2(G)) encompasses a meaning distinct from merely "working." Along with other amici curiae, the California Labor Commissioner notes that "the time the employee is suffered or permitted to work, whether or not required to do so"   (*ibid.*) can be interpreted as time an employee is working but is not subject to an employer's control. This time can include work such as unauthorized overtime, which the employer has not requested or required. . . ."In all such cases it is the duty of the management to exercise its control and see that the work is not performed

27

if it does not want it to be performed.". . .Thus an employer who knows or should have known that an employee is or was working overtime must comply with the provisions of [29 U.S.C.] § 207 [maximum hours]." [Citations]

In the case of Title Officers and Title Assistants, both Burda and Hess testified that prior to February of 2010, overtime compensation was deducted directly from each employee's commissions. (Decl. of Burda at ¶5; Decl. of Hess at ¶5). As a result, neither reported any overtime whatsoever prior to February of 2010. (Decl. of Treglio at Exh. 17 and 18). However, once the reporting of overtime effectively increased the share of the Title Unit's commissions each would receive, they both began reporting their overtime hours. (Id.) Even then, Burda testified that he would shave off overtime hours at the request of the other members of his Title Unit. (Burda Decl. at ¶7). Burda was eventually fired from Fidelity for working "excessive overtime." (Decl. of Treglio at Exh. 15).

Lori Callison and Joyce Schemel, who worked for the brand of Fidelity National Title, were both told to not report their overtime hours. (Decl. Schemel at ¶4, Decl. Callison at ¶6). Joyce Schemel, in fact, received an email from the Senior Vice President of Fidelity stating that she was not to report her overtime hours because commissions were paid in lieu of overtime. (Decl. of Schemel at Exh. A). Both Erwin and Palazzo testified that they were not to work overtime unless specifically authorized to do so. (Decl. Erwin at ¶5; Decl. Palazzo at ¶5). Even then, Ms. Erwin was criticized by her supervisors when she reported too many hours of overtime. (Erwin Decl. at ¶5).

The requirement that Fidelity must know, or should have known that Plaintiffs and other members of the Class are working off the clock is not as big of an issue as the Court may think. After all, the Named Plaintiffs and the Class Members are all full-time employees of Fidelity working during regular business hours, who either arrive early, or who stay late at Fidelity's facilities, in full view of their supervisors. (Decl. of Erwin at ¶¶7 and 8; Decl. of Palazzo at ¶¶7 and 8; Callison Decl. at ¶¶8 and 9; Burda

28

Decl. at ¶9).  Moreover, Plaintiffs and the Class Members all must log onto Fidelity's intranet to perform their duties (Decl. Callison at ¶9; Decl. of Treglio, Exh. 2, Williams Depo. at 84:23-85:18).   Had Fidelity wanted to know the hours its employees work, it easily could.

### f.    Meal Periods and Rest Periods

According to the named Plaintiffs, employees of Fidelity are supposed to report that they take meal periods every single day. (Decl. of Erwin at ¶7; Decl. of Palazzo at ¶7; Callison Decl. at ¶8; Burda Decl. at ¶9; Hess Decl. at ¶8; Schemel Decl. at ¶5).  In reality, few, if any of the Named Plaintiffs took meal or rest periods, with most eating while working from their desks. (Id).  Thus, while Fidelity allowed meal periods to be taken, it did nothing to ensure that they were being taken. Under the current published California authority, employers are not just required to make breaks available, but are also required to ensure that employees actually take meal and rest breaks.  *Cicairos v. Summit Logistics, Inc*., 133 Cal. App. 4th 949 (2005).  It is clear that Fidelity failed to do so.

Lastly, while the Named Plaintiffs and the Class Members may have differing amount of damages for each of the six issues listed above, that alone is not a deterrent to class certification. In this case, many of the components of damages, such as not including the commission in the overtime calculation, or improper deductions, are calculable from Fidelity's payroll software records or the wage statements themselves.  This is true also for the penalty claims, such as the 226 violation for not itemizing the commission calculations.  Two of the claims, for off the clock time and missed meal breaks, will require use of Fidelity's intranet activity data or survey information, but this is customary in wage and hour cases. See *Bell v. Farmers Insurance Exchange* (2001) 87 Cal.App.4th 805, 820, (reliable *statistical sampling* may be used as basis for determining class damages for unpaid overtime). Determining the amount of damages is a mechanical recomputing the appropriate hourly rate for overtime, the number of

29

missed meal periods, the review of log-in and log-out times on Fidelity's intranet, and determining the number of inaccurate wage statements:

> In cases where the fact of injury and damage breaks down in what may be characterized as 'virtually a mechanical task' 'capable of mathematical or formula calculation,' 'the existence of individualized claims seems to offer no barrier to certification on grounds of manageability.'

*Windham v. American Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977).

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their Motion for Class Certification be granted.

Dated: December 12, 2011            **CLARK & MARKHAM LLP**

By:___/s/David R. Markham_____
        David R. Markham, Esq.,
        Attorney for Plaintiffs James Burda,
        Laurel Hess, Lori Callison, Shirley
        Palazzo, Candee Erwin and Joyce
        Schemel

30

# CERTIFICATE OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF SAN DIEGO**

I am employed in the County of San Diego, State of California.  I am over the age of 18 years and not a party to this action.  My business address is 600 B Street, Suite 2130, San Diego, CA 92101.

On **December 12, 2011**, I served the foregoing document(s) described as

1)   **NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES**

2)   **DECLARATION OF DAVID R. MARKHAM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

3)   **DECLARATION OF JAMES M. TREGLIO IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

4)   **DECLARATION OF JAMES BURDA IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

5)   **DECLARATION OF LAUREL HESS IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

6)   **DECLARATION OF LORI CALLISON IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

7)   **DECLARATION OF SHIRLEY PALAZZO IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

8)   **DECLARATION OF CANDEE ERWIN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

9)   **DECLARATION OF JOYCE SCHEMEL IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

on the interested parties in this action:

Curtis Graham, Esq.
Michelle Rapoport, Esq.
Roger L. Scott, Esq.
FORD & HARRISON LLP
350 South Grand Avenue, Suite 2300
Los Angeles, CA 90071
Telephone: 213-237-2400
Facsimile:    213-237-2401
*Attorneys for Defendant*

Nicholas Wagner, Esq.
Andrew B. Jones, Esq.
Daniel M. Kopfman, Esq.

31

LAW OFFICES OF WAGNER & JONES
1111 E. Herndon, Suite 317
Fresno, CA 93720
Telephone:    559-449-1800
Facsimile:      559-449-0749
*Co-counsel for Plaintiffs*

BY U.S. MAIL:

  I caused an envelope containing the above document addressed to the recipient set forth below, with postage thereon fully prepaid, to be placed in the United States mail at San Diego, California.  I am readily familiar with this firm's business practice for collection and processing of correspondence for mailing with the U.S. Postal Service pursuant to which practice the correspondence will be deposited with the U.S. Postal Service this same day in the ordinary course of business (C.C.P. Section 1013(a); 2015.5):

_X_  BY ELECTRONIC SERVICE
  By transmitting the documents listed above, electronically, via the email addresses set forth above.

  XX_  (Federal): I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made, and that the foregoing is true and correct under penalty of perjury.

  Executed on December 12, 2011 at San Diego, California.


        ____/s/James M. Treglio____
          James M. Treglio

32